We are here today to ask the Court to do again what it did when the case was here on the first appeal, which is to examine each basis on which the District Court relied to find Dr. Housey not credible, find each basis clearly erroneous, and this time finally reverse. In the end, when those bases are examined and found not supported in the record, there's nothing left here but disapproval of Dr. Housey's conduct with respect to his colleagues, and that's not a sufficient basis for disbelief about whether he performed the experiment. The District Court essentially relied on three foundations to conclude that it would not believe Dr. Housey. They are that there's no objective evidence that Table 3 was performed, second, that Dr. Housey gave inconsistent testimony about his records, and third, that there was no evidence of 24 well plates in the Weinstein lab. Each one of those is clearly erroneous. First, the finding that there's no objective evidence that Table 3 was performed. There is, of course, evidence of the components of the experiment, of the calculator, undisputed, unanswered testimony of the use of the calculator evidenced in his data books, which Bayer had every opportunity to examine or cross-examine him on, the contemporary typed invention reports, the third of which, date stamped by his counsel, sets out the numbers, the second of which, a few days before, said, by the way, I've done this experiment, details forthcoming, and finally, and perhaps most compelling of all, the very specificity of these numbers. There is no dispute here, and Bayer's own witnesses said, you can't get these numbers, if they're going to be replicable, without doing the experiment. For an experiment like this, that must mean that while the evidence from the specificity could be rebutted, there is a natural way to rebut it, which is to try to replicate the experiment. Mr. Toronto, let me ask you one sort of maybe a kind of a preliminary question. In looking at the district court opinion, it appears that Judge Robinson viewed her task on remand to be to determine whether there were any reasons beyond the reasons that had been rejected in our ruling, as to why Dr. Housie was not credible, correct? Yes. So it seems that really what she felt her job was to do was kind of, I'm not going to use the word academic, but go through an almost sort of process in a vacuum to determine whether this individual was credible. And it looks like she just really, you know, looked at a number of considerations. And how can we really disturb that ruling? I mean, she said she found him not credible. Now, I or one of my colleagues or both of them might, if we were the district court judge, have come to a different conclusion. But there were so many bases that she touched on for finding him not credible. How can we disturb that? Because I think exactly as in the first appeal, where she also found him incredible and said, here's why. The court examined each of those bases and said, you're legally wrong about this. You're clearly erroneous about that. And what was left was nothing. And the court had no trouble at all saying, if there's a credibility determination that rests on recited bases, and those bases are clearly erroneous or infected by legal error, then the ultimate credibility determination can't stand. And this court's action in the first appeal is not idiosyncratic. In fact, in case after case, when a district court finds that there is inequitable conduct and hears the witnesses who were the alleged deceivers come in and say, oh, I didn't mean to be deceptive. And the district court says, but I find you to be deceptive. That is nothing other than a finding. You're not credible. But in case after case, this court says, that's not enough. There has to be a factual basis for a finding of deceptive intent, which is to say a finding of lack of credibility. The court said that in terms in Herbert against Lyle, a month ago or two months ago in the Attafina case, the court quoted that very same standard. And the reason, I think, is that clear and convincing evidence standard, as applied to the most explosive of possible charges against a scientist, fabricating data, demands nothing less than objective, concrete evidence. And it can't rest on what amounts to, for example, a hunch. And correct me if I'm wrong, Mr. Torano, but one of the things that Judge Robinson relied on was what she perceived to be, and I'll use the word dissembling, as represented by what Dr. Housley said in a deposition with respect to whether records of the test were present in the boxes in the room. And then his response when there was a discovery order. Yes. I mean, that seems to me to be something, it's very difficult to intrude on the judge's finding. Let me disagree with that. If the representation or her characterization of inconsistency in testimony were true, then that would be at least the beginning of a sound basis for saying, I don't believe you. But in fact, it's clearly erroneous. And it's clearly erroneous for the simplest of possible reasons. Judge Robinson simply misunderstood the deposition testimony, little excerpts of which were put in the record, and I think virtually all of which is printed in the red brief, in Bayer's brief. It is as simple as this. Dr. Housley never said that there were handwritten records. He always said that there might have been a calculator printout. The questions that he was asked in the deposition that were printed were not limited to handwritten records. We quote them in the reply brief, the excerpts. They were all about records in general. And he always said there might be some records in the boxes, namely the calculator printout if it existed. He kept such extensive records every place else. Where there was no reason for secrecy, Your Honor. That's the critical thing that fully explains what for a tiny experiment directed by counsel to keep out of the public view in his lab, don't put records in your lab book. So the secrecy, which the district court originally condemned him for last time, this court reversed and said, you haven't fully understood that secrecy has a legitimate place, indeed is required in patent law to protect against public knowledge under 102 to invalidate your patent. So the district court said that Dr. Housley had said two things that she found to be inconsistent. One is just a clear error in understanding what the deposition testimony was, in which if you simply distinguish handwritten records from other records, namely a possible calculator printout, there is absolutely no inconsistency. The second thing was that the district court simply misunderstood what the testimony was, I'm sorry, about what she thought that Dr. Housley said to his counsel in the first invention report, all of the invention experimental results in my patent are in my notebooks, cannot possibly apply to table three. The first invention report predates table three. The statement that she relied on is explicitly about the experimental results in the cell paper. It predates the submission of table three, but what is the record evidence that the alleged experiment occurred in the period between the submission of invention report one and the submission of invention report three? Dr. Housley testified that this 28, 30 day experiment was being done at that time. I think, didn't he say something like during in the months, plural, before the submission of the report? I think that's probably right. But the important point is that the statement that Judge Robinson looked at in the first invention report is in terms about nothing but the cell paper, which doesn't contain table three. So put aside my point that it couldn't be about table three. It is about the cell paper and Bayer's counsel's follow-up question at trial when asked about this expressly says, and we quote this in the reply brief, so that's about the cell paper. Yes, of course, it's in terms about the cell paper. It couldn't, it isn't about the table three experiment. And indeed, the sequence of the three invention reports is the first invention report is right at the end of December, beginning of January. The second invention report is almost a month later. And it says, by the way, I've done an experiment with tamoxifen unpublished results. A few days later, the numbers come in, in the third invention report. So the two bases of that inconsistent testimony that Judge Robinson set out are both, I think, simply clearly erroneous. They misunderstand. I think really beyond dispute, what the statements were that Dr. Housey made. The third, so aside from the inconsistent testimony points being clearly erroneous, and the judge having wholly ignored the positive side of the evidentiary equation or balance, namely the specificity, the last point is the no 24 well plates. And on that, Judge Robinson said, there is no evidence that there are 24 well plates. That's clearly erroneous too, because Bayer now concedes that Dr. Eufing used 24 well plates in the Weinstein lab. Take that, the statement by Judge Robinson that there were no 24 well plates in the lab away, and the foundation, the only foundation for the inference somebody else in the lab would have seen disappears. As of what date was the Eufing use of well plates? Sometime in the spring of 88. So he came to the lab in, I think, February of 88, which is the month that the patent application is filed. And he's doing this work in the spring. The patent application is filed early in February, right? And Eufing arrives... Right around then. All right. Right. So he's doing this experiment in the spring, I mean, after the application is filed, but there is... And therefore, after the experiment, presumably, was done. Yeah, yes, yes. But the question is, is there... And the district court didn't distinguish anything about time periods, right? The question is, are 24 well plates available in the lab? Well, they were used in the lab a few months later. In fact, Dr. Xiao and Dr. Guadagno said, we never saw it. They were there at the time. They evidently didn't see Dr. Eufing's use. If one then now goes to the next stage and say, look at materials that meet the incredibly high standard for judicial notice. Matter that put a fact beyond reasonable dispute. The published articles, the materials and methods of articles in the Weinstein lab, the Hoshina who did the Hoshina deposition, Hoshina was said in the transcript by Dr. Weinstein to have done experiments with Dr. Eufing. All indicate beyond reasonable dispute, they were using 24 well plates. Now it's just senseless to think that these standard equipment, the standard equipment somehow appeared in the lab throughout the 1980s, disappeared for a few months in late 87 and early 88 and then reappeared in the spring of 1988. None of these uses were seen by Xiao and Guadagno. And the district court, of course, did not say that any witness testified that there were no 24 well plates in the lab because they didn't. Accepting your proposition that a finding of inequitable conduct can't be based on lack of belief in the proponent in the absence of some objective evidence to the country. But it is a two-part question. One is, does a determinationist demeanor, can that contribute to the determination as long as there is some objective evidence of, let's say in this case, non-performance of a critical experiment? And two, do you read Judge Robbins' opinion as having reflected a demeanor-based determination of credibility? Um, no to the second question. There is no reference, there is only the statement, I had to make a subjective determination. Yeah, I want a subjective credibility determination. Right, but then she says, record, record, record. Here's why I make that subjective determination. But she says, I listened for some period of time to these folks and I believed them and not him. I mean, it sounds like woven into that, perhaps she didn't use the word demeanor, but it seems like woven into that is an assessment of demeanor. And I just wonder whether you think that's, whatever we conclude as to whether that is in fact what she did, is that a legitimate basis among others? Well, I do think one would have to be able to see that there is something about the shiftiness of the answers given something, some basis for the demeanor testimony. Are you, I'm sorry, finish your answer, Mr. Toronto. Let me say, when Judge Robinson says, I believe these other witnesses, look at what Judge Robinson cites. There is nothing there that says, this witness testified, you know, he didn't do the experiment, couldn't do this tiny experiment. No witness testified, there were no 24 well plates available in the lab. All she finds is that one witness said in answer to a question, well, with all these plates floating about the lab, how do people tell the difference between the ones that belong to them and the ones that belong to others? And Dr. Shao says, well, people put labels on them. That doesn't even come close to saying, we all can get down on our knees in front of these little incubators which hold 400, 500 plates, inspect what's going on and see who's up to what. There's no testimony like that. I'm sorry, Judge Shao. No, no, I jumped in on you, Mr. Toronto, because you were answering Judge Bryson's question. Let me ask you this. You've pointed, well, let me get right to the question. Is it your view that if a judge, trial judge relies on demeanor, that he or she must expressly so state, in other words, if a judge finds a witness not credible and one of the factors in the equation in the judge's mind is the demeanor, what you refer to as shiftiness on the stand and that kind of thing, do you think the judge has to articulate that expressly in the opinion? Here's my view. I don't know of any case in which the heavy, clear and convincing evidence standard was held to have been met on the basis of demeanor alone, period. And I certainly don't know of any where even demeanor went into, but became even the dominant consideration without other truly substantial objective evidence without the demeanor having been explained. I'm thinking in particular of Judge Gallarza's opinion a couple of years ago, which talks about demeanor. And he drops a footnote to say, look at the shiftiness of the answers. We can see as appellate judges what the basis for the demeanor assessment is because otherwise what you have is something as devastating as a fabrication finding being held to have met the clear and convincing evidence standard on the basis of nothing but essentially an unreviewable hunch by a district court. And that shouldn't be enough. Thank you. Thank you, Mr. Taranto. We will restore your three minutes of rebuttal time. And if you could give Mr. Bove 18 minutes, should he need to use that. Gerard Halsey invented a patent. He fabricated highly material data. This court remanded solely on the issue of credibility and requested that the district court supply additional bases for her determination that his testimony was not credible. She made a subjective credibility determination. What do you make of that language? Do you read that as demeanor? Absolutely. She observed him testify for two days at trial. And we actually reprinted what I believe is a critical piece of that testimony relating to the cross-examination of Gerard Halsey on his inconsistent deposition testimony. Indeed, in January of 2002, he testified that the underlying data may be in the lab notebooks. It wasn't there. He didn't know. In April of 2002, as a 30B6 witness for Halsey and individually, he testified that the underlying data was presumably in the boxes in the deposition room. Behr hired Dr. Fields to review all the boxes in the deposition room. Could not find any underlying data. Moved to compel. The district court granted the motion. And then Dr. Halsey testified in August of 2002 for the first time that there were no handwritten records. That indeed, he used a calculator, supposedly, to record data. But again, to go to Mr. Toronto's point, where in the earlier statements does he make an assertion with respect to handwritten notes? I'm not sure I see the, at least, there doesn't appear to be a square contradiction there. There may not be a square contradiction, Your Honor. But when you look at the totality of his testimony, and let us consider this, he testified that based on the advice of counsel, he did not follow scientifically customary record-keeping practices, and he did not follow his own customary record-keeping practices. Well, let's stay, if we could, maybe you're coming back to it, but let's stay with the asserted inconsistency, because Judge Robinson found that, I think, to be pretty important, and therefore, we have to look at it carefully. What is the nub of the inconsistency that you can point to, and you say, aha, there's where he said X on day one, and he said not X on day two? Your Honor, what we have is he said underlying data, this is the record, maybe in the lab notebooks, not that there were no underlying data in the lab notebooks. But his contention was never that there was no underlying data, as I understand it, if you construe the printout of the calculator to be the underlying data. The district court, yes. The district court viewed his early deposition testimony as, quote, not forthcoming, not forthcoming, that he withheld information as a 30 to six witness, and had to issue a motion to compel. Dr. Housie did not testify honestly. He said the data's presumably there, when he had to know it wasn't there, because he said that he was counseled by his lawyer. Well, wait, but again, why did he have to know it wasn't there if his reference to data, not inconsistent as far as I can tell with the question, could be construed as a reference to the calculator printout? He was a 30 B6 witness. Yeah. And he testified that the underlying data, be it handwritten notes or machine printouts, calculating various observations, were presumably in the boxes. Right. They weren't in the boxes, and he had to know this. That's simply, if the thing was lost or whatever, I mean, he's just saying, if it is anywhere, it's going to be in the boxes. That doesn't seem to be inconsistent with the ultimate failure to discover the materials. I mean, I've got plenty of boxes in my basement, and I could tell you that my tax records from 1994 are presumably in one of those boxes, but it wouldn't surprise me a bit, and I wouldn't be a liar if we looked and we couldn't find it. Your Honor, as a 30 B6 witness, Gerard Housey was obligated to testify truthfully about the status of the underlying data. He said it was presumably there, and it was not. What about the specificity of the data? I mean, you've got numbers here that, well, they play out too. They're accurate. How do you come up with those just if you haven't performed an experiment? There was testimony that the data was not statistically significant. It was not statistically significant because there was testimony that one could not get an adequate number of cells in these very, very tiny little plates in the 24 well-placed dishes. There was testimony, indeed. Well, this is a point that I had a problem with in reading the briefs, and it helped me out. It seems to me there's a difference between saying the data was not statistically significant, that is to say it wouldn't have told a careful scientist anything really important about the conclusions that one should reach, versus that the data was not such that you would assume from the conclusions in the data that you did this experiment. Those seem to me to be two different questions. The specificity of the numbers is not directly probative of whether or not the test was done. But why not? One can make up specific numbers. One can fabricate specific numbers just as easily as non-specific numbers. It doesn't prove anything. Well, but if it turns out that those numbers would be the same numbers you would reach with running the experiment again, it seems to me it proves a lot. Now, of course, I know that the evidence, neither side, at least as of the close of the evidence, had produced anything that's so indicated, but... There was testimony, Your Honor, that the experiment was not reproducible. Dr. Ufig tried to perform similar experiments after Dr. Halsey allegedly had conducted the Table 3 experiment. And he clearly stated that it did not work. In fact... But what did he... I read that testimony. What did he mean by did not work? It couldn't... They didn't have the capacity to do it, or if you did it, you didn't get any results at all. What did he mean? Flesh that out for me. One of the statements that he made, and this is, I believe, highly significant, was that you could not, with the use of the microscope available in the lab... And in fact, I believe this is so significant that I want to give the record citations to this. Dr. Hsiao testified at 57.93 to 94. Dr. Godogno testified at 58.51. And Dr. Ufig testified at 54.33, that the microscope available in the lab was not such that one could count the cells in these tiny, tiny little plates of the 24 well plate dishes. And they were unequivocal on that testimony. Indeed, Dr. Godogno went so far as to state it was impossible to do, impossible to do. I think that that... Let me ask you this question. I'm trying to get at this problem, because frankly, this is, just as Judge Schrader asked the question, I have the same problem. I mean, if I am trying to blow something by someone, it's a bold step for me to just invent numbers which could, if somebody else did the same experiment, could be shown to have been so preposterous that they would immediately show me to be a fraud. However, if I have some pretty good idea of what those numbers are going to be, or ought to be if I actually did the experiment, then I might be able to get away with it. I mean, for example, I say, well, I've just invented a new way to measure the speed of light. And guess what I got? I did it, and I came up with 185,900 miles per second. That doesn't show very much about my success in having a new method, right? Is there anything in this case that suggests that Dr. Halsey might have had an idea as to what those numbers should be, and therefore what he ought to put in on the assumption that this was false? The testimony as to Dr. Halsey's background was that he was highly skilled. He had been working in a lab. Of course, he's experienced, but is there anything with specific application to this experiment that would indicate that somebody who knew a lot about this field could say, here's the experiment I'm going to run, and I bet you I get these numbers. I'm not aware of anything in the records specific to that point. Okay. There was testimony in the record by Dr. Weinstein that he believed the data was fabricated and that the data made no sense. Which we also thought was a significant point. One other point here on corroboration. It is significant that when one looks at the invention records, one does not see a single mention of a 24-well plate dish. And I went back and I reread these records very carefully, and I saw mention of 10-centimeter dishes, which were standard format in the lab, according to the testimony. I saw mention of 96-well plate dishes where the experiments were being formed and calculations were being done with a machine, but I saw no mention of 24-well plate dishes in those invention records. And these are the records which Dr. Housey relies upon solely as corroborating his testimony. I would submit that they do not corroborate his testimony, that he performed this test with 24-well plate dishes. And if anything, they tend to suggest quite the opposite, because there were mention of the standard-well plates throughout these invention records. It's 24-well plates. Excuse me. We asked for additional bases. One could construe the efforts of Judge Robinson as giving us back the same bases. Is that a problem for you? I don't agree with that, Your Honor. I don't believe that's what she did. She specifically stated, based on, frankly, sitting through a Benz trial, which she specifically remarked about, where Dr. Housey unequivocally testified for two days that she did not believe him. She heard the cross-examination, which we reviewed in our brief, and she was not impressed with his answers to that. And she weighed, and specifically said this, weighed his internally inconsistent testimony, or not forthcoming testimony, against that of the other witnesses. And she specifically stated that she found the other witnesses credible. And these are the witnesses whose testimony I have specifically recited to the court today. Mr. Boehme, a question that I have is, at the end of Mr. Taranto's main argument, we got into a discussion about demeanor as a factor in the credibility determination. And I think at the start of your argument, you conveyed that it was your view that demeanor was sort of woven, a demeanor finding, if you will, was sort of woven throughout the judge's opinion. Assume for the moment that one disagrees, and that there's no demeanor factor in the equation here. Do you still have enough here? We believe we do. Because then it really does turn on the kinds of questions that you've been discussing with Judge Bryson and Judge Rader on the figures, and how they add up, and how they don't add up, and what was in the boxes, and the way you could interpret what was said. The trial judge relied upon the testimony of other witnesses that one could, and I want to repeat this again, could not use that microscope. To count cells in these little tiny well plate dishes. There proved a negative. There proved there were no primary data. There proved that the microscope could not be used in the manner described by Dr. Housing to count cells. Did she get into the microscope issue? She mentioned that at JA-12, Your Honor. Did she? Okay. She mentioned it in a sentence relating to multi-well plates, but the testimony that I cited is specific to 24 well plate dishes. Let me ask you this. Mr. Booth, Judge Bryson's question raises a thought in my mind. Are we or are we not limited to the points that are articulated in Judge Robinson's opinion? Or could we, if we were so inclined, and we may or may not be so inclined, to comb through the record and find points that evidentiary matters that support her view that aren't stated in here? Or do we just have to go with what she said in light of our previous decision? Your Honor, it's my understanding that if there is evidence of record, part of the trial record in this case, that supports the findings of the trial judge, and if this court were to undertake the effort to locate that evidence and found it supportive, that the court certainly could do so. However, I think we're talking about whether or not the finding of fabrication is clearly erroneous. So we're looking for whether or not there is evidence to support that finding, and whether or not this court has a definite and firm conviction that the judge clearly erred. Could I ask you to discuss, you've adverted to it previously, but Mr. Toronto has, in his brief and again at oral argument today, discussed the 24 well plate issue with specific reference to the evidence that at times throughout the pertinent period, there were indications of 24 well plate use in the lab. Can you address that? I certainly can. Two components to this. The only lab book that we are aware of in the record indicating the use of 24 well plates is Dr. Eufing's lab notebook. And Dr. Eufing stated that when he arrived in that laboratory, and this is at 5434, your honor, in the record, that 10 centimeter dishes were the standard format in that lab, and that the 24 wells weren't there. The other... Did he actually say weren't there? They just didn't exist? I could quote the testimony, but that's the page. He was very specific. I believe that his testimony was, we can look it up, that they were not there. And there's out of record testimony, which I won't get into from Dr. Eufing that would clarify this, but I'll stick to the record here. I don't think you want to go out of record testimony. But I will refer to Dr. Housie's out of record testimony, which is the articles that he seeks to introduce through judicial notice. At trial, Behr actually sought to introduce those articles. Housie objected, and Housie's objection was sustained, and the articles were excluded from the trial record, based on Housie's objection. Now, Housie has come back and taken the district court to task for not judicially noticing the articles that were excluded from the record based on Housie's objection, and then goes a step further and asks this court to take judicial notice of those articles. There's been no testimony relating to those articles. They're outside the record, and we certainly don't believe that the district court abused its discretion in declining to open the record, particularly in view of this court's prior mandate that she not do so by disregarding those articles. But I might add that those articles, one of the pertinent articles, if one were to consider it, and we don't believe that it's properly considered, was an article by Fairbanks, and I thought that was instructive because he apparently used, and I'm not a total expert on this, but as I read it, he used 24 well plates, but he harvested the cells, and then he used a coulter counter to count those cells, not a microscope, and I found that to be significant. But what it illustrates, Your Honor, is that without testimony about these articles and the examination of these articles, I don't believe that they're probative of whether or not Dr. Howsey used a microscope in the Weinstein Laboratory during some time, because we don't know the time, he was unable to specify it, to count cells, not use a machine. Hopefully I've answered your question. Thank you. With that, Your Honor, if the court has no other questions. Actually, I do have one more if my colleagues don't. The reference to the findings, this is, I think, in the first invention report, January. Yes. The reference to the statement that Judge Robinson quoted about all of these findings and discoveries are documented in my laboratory notebooks. That does appear to be, well, two points. One, in the section dealing with history, which goes back, and two, also to predate the introduction, which occurs in invention report number two, of the experiment, which in invention report number two is simply referred to as unpublished observations, but then in three, it shows up as a table. Why should we give this the same significance that the trial judge did, or should we not? What the trial judge cited was at 5340 of the trial transcript, where Dr. Halsey testified that the findings and discoveries, and again, I don't want to use the precise words, of his invention were in his lab notebooks. And that's what the trial judge relied upon to support that statement. The trial judge did not cite the invention records for that statement. Now, what Your Honor has characterized is correct in terms of what the invention records state. But I just want to make the point that that's not what the trial judge, in her opinion, relied upon for this. All right. Thank you, Mr. Bow. Thank you, Your Honor. Mr. Toronto, you have three minutes remaining. Mr. Toronto, I'm going to, because time is so fleeting, I'm going to spring with a question here and sort of follow up. Part of the discussion we were having with Mr. Bove, we sent the case back to Judge Robinson and set forth any additional reasons why you find Dr. Halsey not credible or incredible. In reviewing her decision to determine whether or not, it's clearly erroneous, are we limited to the points upon which she bases her determination? Let me answer that. Yes, and here's why. This court can't make factual findings. So any factual finding that Bayer urges that doesn't appear in the district court decision is not available. And presumably, the district court took this court's remand order at its word, tell me every reason you have for finding Dr. Halsey incredible. So that's the point about factual findings. Let me just give an example. For example, say there was evidence in the record, say Bayer could point to evidence in the record showing that Dr. Halsey was on vacation during a critical week. I'm not saying that's the issue, but I'm just raising that as a hypothetical. And Judge Robinson did not rely on that point. You're saying we couldn't consider that. No, here's what I think is the right way to view this. The point I've already made is the court can't make factual findings that the district court doesn't make. The next question is, can the court rely on evidence to support factual findings that the district court did make? And I think the answer to that is no, unless that evidence is essentially beyond dispute, is unambiguous, and its foundation is not in question. Every bit of evidence that Bayer points to to support even the factual findings the district court makes is precisely the kind of evidence that the district court presumably did not cite because there is grave reason either to question its foundation or to question its meaning. When the district court heard various evidence statements by Dr. Guadagno, for example, about what was in the lab, what was not in the lab, perfectly clear, Dr. Guadagno said single-cell dishes were standard, but in fact, what I saw was use of multi-well dishes. The court relied on that for its ruling last time. She made a reference to, that is, Dr. Guadagno made a reference to the microscope, but the district court did not conclude that on page 12 of the joint appendix, which Bayer just referenced, did not say, did not find that you couldn't do the experiment because of the microscope, and that's because it's very easy, in fact, proper to understand Dr. Guadagno's testimony as nothing other than, in the lab, we generally didn't use other than the six-well multi-well dishes because we had accuracy problems, not that it couldn't be done. So this court is not in a position to take evidence that the district court avoided citing because what it means is genuinely in dispute. Now, if there were the kind of evidence you talked about, and there was a plane ticket, and he was in London when he said it, he did it in New York, that wasn't in dispute, then I'm not going to argue that you can't rely on that kind of evidence to support an actual factual finding, but we don't have that for, because everything that they rely on is at least in the disputable category. Page 5340 of Housey's testimony, which Mr. Bove referred to, all that is is a question about what the first invention report said. That's what the district court was citing. And if there are no further questions, I see my time has run out. Could I, actually, please, another question. Again, getting back to, this may be an insoluble problem because of the record restrictions in this case, but what is the best way for us to approach the problem of, were these numbers predictable or not, and therefore, would we be more likely to suspect that they wouldn't have been put in unless the experiment had been done? Again, my, you understand the question. My 186,000 miles per second example for the speed of light. Right, and I think that the best way to approach that question is through the testimony we cited, I think of Dr. Shao and Dr. Krause, if I remember right, at the beginning of our brief, in which both of them said, not with specific reference to table three, but with reference to these kinds of biological experiments in which you test substances. The reason we do the experiments is that you can't just predict the numbers in advance. That's the reason you do the experiments. These are very specific numbers with different gradations of responses to different levels of the chemicals. And as I think Mr. Bove acknowledged, there's no evidence to the contrary. Nobody said, oh, these are the kinds of numbers that at that level of specificity you really could make up. So I think what we have is an unanswered record, which makes, I think, perfect common sense anyway, that these kinds of numbers, if they're going to turn out to be replicable, can't simply be made up. And they're very unlikely. They can be made up, but it's riskier, of course. If they turn out to be replicable, is what I mean. And I think they're not likely to be made up when you know for sure that somebody's going to replicate them, which is what you do when you put them in a patent that you're going to assert against industry, which has vast resources to do everything in its power to say this is a bad patent. So it's very unlikely that these numbers were in fact made up. It is a bold thing. And that's positive evidence on the positive side of the scale that the district court simply didn't discuss. Thank you, Mr. Taranto.